**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

SAMUEL R. GEBHART,                          :
                                            :
                       Plaintiff,           :
                                            :
        v.                                  :   C. A. No. 12-1289-RGA-MPT
                                            :
MICHAEL J.  ASTRUE,                         :
COMMISSIONER OF                             :
SOCIAL SECURITY,                            :
                                            :
                       Defendant.           :

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Plaintiff Samuel R. Gebhart ("plaintiff") filed this action against defendant Michael J. Astrue, then Commissioner of Social Security ("defendant").[1]  Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. 1383(c), of a denial of his application for Social Security Disability and Supplemental Security Income benefits under Title II and Title XVI of the Social Security Act (the "Act").  Presently before the court are the parties' cross-motions for summary judgment.  Plaintiff seeks reversal, or in the alternative, remand to a different Administrative Law Judge ("ALJ").  Defendant requests the court affirm the decision to deny benefits.

## II.    BACKGROUND

### A.    Procedural Background

---

[1] Carolyn W. Colvin became the Commissioner of Social Security on February 13, 2013 after briefing began.  Although under Federal Rule of Civil Procedure 25, Carolyn W. Colvin should be substituted for Michael J. Astrue, pursuant to 42 U.S.C § 405(g), no further action is necessary to continue this action.

Plaintiff applied for disability insurance benefits ("DIB")[2] on July 25, 2005, alleging he was disabled since September 30, 2004 due to pericardial diffusion, a gunshot wound to his right calf, and nervous breakdowns.[3]  His application was denied initially on February 16, 2006,[4] and on reconsideration on March 2, 2007.[5]  On April 23, 2007, plaintiff filed a written request for a hearing.[6]

A video hearing before ALJ Judith A. Showalter was conducted on March 17, 2008.[7]  Plaintiff, represented by counsel, testified at the hearing.[8]  Mitchell A. Schmidt, an impartial vocational expert, also appeared at the hearing.[9]

On July 10, 2008, the ALJ issued a written decision denying plaintiff's application for DIB.[10]  The ALJ noted plaintiff's insured status expired on March 31, 2007, requiring disability be established on or before that date.[11]  The ALJ determined plaintiff was not disabled under sections 216(I), 223(d), and 1614(3)(A) of the Social Security Act.[12] Specifically, she found plaintiff had severe impairments, including posterior tibial tendon disorder, status post-gunshot wound, and personality disorder, but none, singly or in combination, met or medically equaled the criteria for listed impairments under the Act.[13]

---

[2] D.I. 8 at 134-40.

[3] *Id.* at 75-76.

[4] *Id.* at 49, 75-76.

[5] *Id.* at 50-52, 84-89.

[6] *Id.* at 90.

[7] *Id.* at 53-69 (plaintiff appeared in New Castle, DE, while the ALJ presided over the hearing from Dover, DE).

[8] *Id.* at 55.

[9] *Id.*

[10] *Id.* at 53-69.

[11] *Id.* at 55.

[12] *Id.* at 69.

[13] *Id.* at 57, 61; *see also* 20 C.F.R §§ 404.1520(d), 404.1525-26, 416.920(d), 416.925-26 ("The Listings represent medical conditions of such functionally limiting severity that an individual who establishes that he meets or medically equals the criteria of a listed impairment could not reasonably be expected to engage in sustained work-related activities.").

The ALJ determined plaintiff had the residual functional capacity ("RFC") to perform simple, routine, unskilled, sedentary work at a non-production pace.[14]  The ALJ also found the RFC required plaintiff to do occasional postural activities, and precluded him from exposure to extreme temperature and humidity, as well as from climbing ropes, ladders, or scaffolds.[15]  Consequently, the ALJ concluded plaintiff was employable and not disabled.[16]

Plaintiff then filed a request for review on July 17, 2008,[17] and the Appeals Council remanded the matter to the ALJ on June 23, 2010 for further consideration and to obtain additional evidence.[18]

On August 18, 2011, another video hearing was held before ALJ Judith Showalter.[19]  Plaintiff again testified at the hearing.[20]  Christina L. Beatty-Cody, an impartial vocational expert ("VE"), also testified.[21]

On December 2, 2011, the ALJ again denied plaintiff's application for DIB.[22]   In that opinion, the ALJ concluded, although plaintiff had the same severe impairments, along with substance addiction disorder and depression, he maintained the previously determined RFC,[23] and was not disabled under the Act.[24]

Plaintiff's subsequent request for review was denied by the Appeals Council on

---

[14] *Id.* at 65; *see also* 20 C.F.R  § 404.1567(a).
[15] D.I. 8 at 65.
[16] *Id.* at 69.
[17] *Id.* at 106-107.
[18] *Id.* at 72-74.
[19] D.I. 9 at 1144.
[20] *Id.* at 1145, 1151-60.
[21] *Id.* at 1145, 1160-63.
[22] D.I. 8 at 24-37.
[23] *Id.* at 27-3.
[24] *Id.* at 37.

August 10, 2012, as the Council concluded there was no basis for reviewing the ALJ's

decision.[25]  The ALJ's 2011 decision, therefore, constitutes the final decision of the

Commissioner.[26]

Having exhausted all administrative remedies, plaintiff now seeks judicial review

of this decision.  On January 10, 2013, plaintiff moved for summary judgment.[27]  On

March 25, 2013, defendant cross moved for summary judgment.[28]

### B.    Factual Background

Plaintiff was born on March 7, 1963,[29] and was forty-four years old as of his last

insured date.[30]  He is considered a "younger person" at all times relevant to his DIB

application.[31]  Plaintiff is a high school graduate with prior vocational experience as a

heavy equipment operator and a tree service worker.[32]  His detailed medical history is

contained in the record; this Recommendation will provide a summary of the relevant

medical evidence.

### 1.    Medical Evidence

Plaintiff's complaints of pain associated with a number of injuries and conditions

occurred prior to the alleged onset date.  His treatment records reflect a long-standing

history of substance abuse and mental illness.[33]

--------

[25] *Id.* at 10-13.

[26] *Id.*

[27] D.I. 11.

[28] D.I. 19.

[29] D.I. 8 at 36.

[30] *Id.* at 25.

[31] *Id.* at 25, 36; *see also* 20 C.F.R. § 404.1563 ("If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45–49 are more limited in their ability to adjust to other work than persons who have not attained age 45.")

[32] D.I. 8 at 36, 157.

[33] *Id.* at 58.

### a.    Back/neck pain

In June 2004, plaintiff sustained cervical and thoracic strain injuries resulting from a motor vehicle accident,[34] causing neck and upper extremities' pain and numbness of the hands.[35] On August 2, 2004, plaintiff visited Wai Wor Phoon, M.D., for a nerve conduction test, which yielded normal results, with no evidence of neuropathy or radiculopathy.[36] Plaintiff briefly sought treatment for his symptoms from Jeremy Rivada, PT, ("Rivada") of DYNAMIC Physical Therapy and Aquatic Rehabilitation Centers.[37] On August 6, 2004, Rivada reported decreased range of motion and increased muscle tightness with spasms.[38] During that appointment, plaintiff advised he was placed on lighter duty at work and refrained from heavy lifting.[39]

On September 17, 2006, plaintiff was involved in another motor vehicle accident.[40] He began treatment with Frank Falco, M.D., ("Dr. Falco") and Jie Zhu, M.D., at Mid Atlantic Spine for lower back, neck, and leg pain on September 21, 2006 .[41] On examination, Dr. Falco found normal range of motion ("ROM"), no muscle spasms in the back, and some tenderness along the facets.[42] Plaintiff was treated with pain medications for his lower back from September to November 2006.[43] At his November 2, 2006 office visit with Dr. Falco, plaintiff rated his lower back pain as 8/10 without pain

---

[34] *Id.* at 580, 280-81.
[35] *Id.* at 280.
[36] *Id.* at 280-81.
[37] *Id.* at 580-81.
[38] *Id.*
[39] *Id.*
[40] *Id.* at 588, 91.
[41] *Id.*
[42] *Id.* at 583-84.
[43] *Id.* 583-99.

medication, and 5/10 with medication.[44]   During that appointment, plaintiff requested more medication, claiming the pharmacy only provided him 80 of the 120 pills he was supposed to receive.[45]   Because the pharmacy properly filled the prescription, Dr. Falco discharged plaintiff for abusing pain medication.[46]

On August 12, 2010, plaintiff saw his primary care physician, Seth Ivins, M.D., ("Dr. Ivins") for lower back pain.[47]   Dr. Ivins reported decreased range of motion in the lumbar spine.[48]

### b.    Chest pain

On September 10, 2004, plaintiff was seen at the emergency room of Christiana Care for chest discomfort.[49]   He reported being a self-employed carpenter, and taking Xanax and Paxil for anxiety due to the June 2004 motor vehicle accident.[50]   Cardiologist Edward Goldenberg, M.D., ("Dr. Goldenberg") conducted an electrocardiogram ("ECG") and CT scan  ("CT"), which showed no evidence of a pericardial effusion or pulmonary emboli.[51]   Dr. Goldenberg diagnosed "chest pain syndrome, probably pericarditis." [52]

 On October 28, 2004, plaintiff followed up with Dr. Goldenberg for recurrent sharp anterior chest pain.[53]   Dr. Goldenberg performed another ECG and assessed the chest pain as "probably musculoskeletal in etiology."[54]

---

[44] *Id.* at 588.  Pain rating is based on a scale of 0 to 10, with 10 being the most severe pain.
[45] *Id.* at 584.
[46] *Id.*
[47] D.I. 9 at 1008; *see also* D.I. 8 at 28.
[48] *Id.*
[49] D.I. 8 at 331-32.
[50] *Id.*
[51] D.I. 9 at 757.  Dr. Goldenberg is associated with Cardiology Consultants, P.A.
[52] D.I. 8 at 332
[53] D.I. 9 at 757.
[54] *Id.* at 757-58.

On January 15, 2005, plaintiff again reported to the emergency room at Christiana Hospital complaining of chest pain resulting from a fall.[55]  The ECG and chest x-ray presented no probative findings.[56]  Plaintiff was discharged with a diagnosis of "nonspecific chest pain" and prescribed Percocet for pain.[57]

In June 2005, plaintiff visited Union Hospital in Elkton, Maryland, on two occasions complaining of "sharp and stabbing" chest pain.[58]  During the June 6, 2005 visit, he claimed the pain started while fishing and drinking alcohol and the symptoms were identical to those experienced during his admission to Christiana Care in 2004.[59]  Plaintiff related a family history of congestive heart failure, coronary artery disease, and pericarditis.[60]  On June 24, 2005, plaintiff returned to the Union Hospital emergency room with another episode of chest pain, and was evaluated by Christopher Baldi, D.O., who noted that "some features of [plaintiff's] pain and his actions . . . suggest drug-seeking behavior."[61]  During each visit, plaintiff was diagnosed with pericarditis and hypertension.[62]  He also tested positive for Hepatitis C.[63]  Plaintiff was advised to discontinue alcohol and tobacco use, and follow up with his primary care provider, Keith Sokoloff, M.D.[64]

On January 4, 2007, plaintiff visited Dr. Goldenberg for the first time since 2004, for recurrent chest discomfort and shortness of breath associated with "hard work or

---

[55] *Id.* at 284.
[56] *Id.* at 299, 303.
[57] *Id.* at 285.
[58] *Id.* at 371.
[59] *Id.*
[60] *Id.* at 391.
[61] *Id.* at 410-11, 436.
[62] *Id.* at 410-11, 413-14.
[63] *Id.* at 413-14.
[64] *Id.*

emotional upset."[65]  Plaintiff advised taking nitroglycerine for relief.[66]  He stated his activities were limited and still smoked a half a pack of cigarettes a day.[67]  Dr. Goldenberg administered an ECG and diagnosed the chest pain as "not clearly ischemic in origin."[68]

On January 17, 2007, plaintiff underwent a stress test administered by  Richard F. Gordon, M.D., which revealed a regional wall motion abnormality and a moderately sized, reversible inferior defect.[69]  Thereafter, plaintiff underwent a cardiac catherization on January 30, 2007 by James M. Ritter, M.D., (partner to Dr. Goldenberg) which revealed non-obstructive coronary artery disease.[70]

On January 11, 2008, plaintiff was admitted to Christiana Care after developing chest pain during a domestic dispute.[71]  Dr. Goldenberg found plaintiff's chest x-ray was normal and his ECG unchanged.[72]  Two months later, Dr. Goldenberg cleared plaintiff from "a cardiac standpoint" for foot surgery.[73]

Plaintiff continued to see Dr. Goldenberg for chest pain from April 2009 through December 2009.[74]  During the April 7, 2009 appointment, plaintiff advised he continued to smoke and had experienced significant emotional distress.[75]  While his ECG was normal, plaintiff had elevated cholesterol and Dr. Goldberg prescribed Lipitor.[76]

---

[65] D.I. 9 at 751.
[66] *Id.*
[67] *Id.*
[68] *Id.* at 752.
[69] *Id.* at 748-49.
[70] *Id.* at 747, 743-46.
[71] *Id.* at 1097.
[72] *Id.*
[73] *Id.* at 869.
[74] *Id.* at 870-72, 873-88.
[75] *Id.* at 870.
[76] *Id.* at 870-71; *see also id.* at 1077.

Nevertheless, when Dr. Goldenberg was asked on November 23, 2009 whether plaintiff was disabled from a "cardiac standpoint," the doctor responded in the negative.[77]

On November 24, 2009, plaintiff contacted Dr. Goldenberg's office complaining of persistent and intermittent chest pain.[78]  On December 2, 2009, Dr. Goldenberg administered another stress test, which was negative for ischemia and arrythmias, and revealed an ejection fraction of 69%, normal sized chambers, normal perfusion, normal hemodynamic response, and average functional capacity.[79]

On December 15, 2009, plaintiff was evaluated by Dr. Goldenberg for continued activity-related tightness in his chest. [80]  At this time, plaintiff advised he had discontinued alcohol, continued to smoke, and remained under increased emotional stress.[81]  Dr. Goldenberg's diagnosis was atypical angina, and he ordered another cardiac catherization.[82]  On December 28, 2009, Michael E. Stillabower, M.D., conducted the catherization, and found non-obstructive coronary disease with no focal stenosis in excess of 30-40%, intramyocardia with mild bridging.[83]

### c.   Foot/ankle injury

In 1981, plaintiff sustained a gunshot injury which left multiple bullet fragments in his right leg.[84]  On January 6, 2005, plaintiff was seen at Christiana Care complaining of pain in both wrists, right ankle and foot.[85]  X-rays revealed osteoarthritic changes in both

---

[77] *Id.* at 873.
[78] *Id.* at 874.
[79] *Id.* at 876-77.
[80] *Id.* at 881.
[81] *Id.*
[82] *Id.*
[83] *Id.* at 888.
[84] *Id.* at 58, 282, 455.
[85] *Id.* at 282.

wrists and possible joint subluxation in the left wrist.[86]   An X-ray of the right ankle

revealed multiple pellets in the soft tissue compatible with the 1981 gunshot injury, but

otherwise showed no significant arthritic changes or deformities.[87]   The right foot X-ray

evidenced osteoarthritic changes and possible hammertoe deformities.[88]

Plaintiff saw podiatrist James D. Bray ("Dr. Bray") for his foot and ankle pain from

January 2005 through February 2006.[89]   In January 2005, Dr. Bray diagnosed posterior

tibial tendon disorder of the right ankle and ordered a sonogram which occurred on

February 3, 2006.[90]   According to the sonogram, there was evidence of chronic

thickening and fibrosis along the musculotendinous junction of the posterior tibialis

tendon, with the abnormal thickening in the posterior tibialis region possibly representing

the "sequela of previous injury to the tendon."[91]

In May 2006, plaintiff began treatment with podiatrist Jason T. Kline ("Dr.

Kline").[92]   Dr. Kline first treated plaintiff on May 25, 2006 for complaints of foot and ankle

pain and ambulation problems due to occasional "collapse" of the right foot.[93]   Plaintiff

also complained his ankle brace for stability caused pain.[94]   Dr. Kline's examination

revealed subtalar ROM elicited mild pain with no evidence of crepitus.[95]   Weight bearing

analysis revealed severe collapse of the subtalar joint and longitudinal arch.[96]   Dr. Kline

---

[86] *Id.* at 282-83; *see also* STEDMAN'S MEDICAL DICTIONARY 1494 (25th ed. 1990)("an incomplete luxation or dislocation; though relationship is altered, contact between joint surfaces remains.").
[87] *Id.* at 282; *see also id.* at 58.
[88] *Id.* at 282-83.
[89] *Id.* at 452-463; *see also* D.I. 9 at 741-42.
[90] D.I. 8 at 463; D.I. 9 at 741-42.
[91] D.I. 9 at 742.
[92] *Id.* at 890.
[93] *Id.* at 733-34.
[94] *Id.* at 733.
[95] *Id.*
[96] *Id.*

diagnosed a 3/4 function grade of plaintiff's posterior tibial tendons and hammertoe deformities.[97]  He recommended reconstructive surgery for both conditions to stabilize plaintiff's right foot.[98]  On June 22, 2006, Dr. Kline's examination revealed a severe pes valgus deformity secondary to subtalar joint collapse, muscle weakness secondary to nerve damage related to the gunshot injury, and rigid contracted digits of the right foot.[99] Based on these findings, Dr. Kline scheduled subtalar joint fusion surgery which was performed on July 14, 2006.[100]

On August 10, 2006, Dr. Kline's post-operative evaluation noted plaintiff was "doing well."[101]  During this appointment, he applied a fiberglass cast with strict non-weight bearing activity for two weeks, and prescribed a CAM walker, pain medication, and thirty days of physical therapy.[102]

On September 15, 2006, plaintiff began physical therapy with Heather J. Browne, PT, ("Browne") at DYNAMIC Physical Therapy & Rehabilitation Center.[103]  At that time, plaintiff rated his pain in a range of 8/10 to 10/10.[104]  Browne reported plaintiff's overall rehabilitation potential as fair, and he tolerated therapeutic treatment activities with mild complaints of pain and difficulty.[105]  On October 6, 2006, plaintiff told Browne he felt "a lot better" since physical therapy began.[106]  Browne observed plaintiff had increased

---

[97] *Id.* 733-34.
[98] *Id.* at 734, 720
[99] *Id.* at 726.
[100] *Id.* at 726-27, 709-725.
[101] *Id.* at 705.
[102] *Id.* at 702-705; *see also* D.I. 8 at 573.
[103] D.I. 8 at 578.
[104] *Id.*
[105] *Id.* at 577-79.
[106] *Id.* at 575.

mobility, and could walk without a boot.[107]   Plaintiff reported exercising on his own,

including using five pound weights at one hundred repetitions a couple of times per day,

walking on the treadmill for five miles per day at five miles per hour, and doing fifty

pound leg presses.[108]   Nevertheless, he reported pain after walking for a long time, at

night and in the morning, and at extreme ankle ROM.[109]   Browne advised plaintiff to

temper his exercise activities.[110]

On October 18, 2006, Dr. Kline diagnosed plaintiff's right subtalar fusion as

"successful" and "totally healed."[111]   Despite these findings, Dr. Kline concluded plaintiff

was "temporarily disabled until further notice," and scheduled a second surgery for

digital reconstruction.[112]

On November 28, 2006, plaintiff underwent surgical reconstruction of his right

foot.[113]   Dr. Kline prescribed post-operative pain medication until December 12, 2006.[114]

Shortly after his November 2006 surgery, plaintiff experienced tenderness in his

right toes, determined to be caused by a screw that migrated distally.[115]   As a result,

plaintiff was admitted on January 25, 2007 to Glasglow Medical Center to have the

appliance surgically removed.[116]

Plaintiff visited Dr. Kline regularly following his 2007 surgery, and often

---

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] D.I. 9 at 700.

[112] *Id.* at 695 (finding plaintiff temporarily disabled on October 18, 2006); *see also id.* at 700 (recommending further surgery).

[113] *Id.* at 687-692; *see also id.* at 650-676; *id.* at 658 (procedures included joint fusion, lengthening and arthroplasty.

[114] *Id.* at 679-80, 682-83, 686.

[115] *Id.* at 630; *see also id.* at 959.

[116] *Id.* at 622-39, 645-49.

12

complained of right foot and ankle pain.[117]  Dr. Kline continued with pain medication and

referred plaintiff to Emmanuel Devotta, M.D., ("Dr. Devotta") of Brandywine Pain

Management.[118]  On March 9, 2007, Dr. Devotta performed a physical and a pain

management evaluation.[119]  He observed plaintiff wore a boot over his lower right

extremity, had multiple well-healed surgical scars and significant decreased ROM in the

ankle with diffuse allodynia and mild edema.[120]  Dr. Devotta recommended a lumbar

sympathetic block to reduce lower extremity hypersensitivity.[121]  However, there is no

documentation that plaintiff underwent this procedure.[122]

    In a May 2007 letter concerning plaintiff's disability status, Dr. Kline opined that

the recovery process was ongoing and discussed plaintiff's difficulty with pain

management.[123]  Dr. Kline felt the pain was due to a "nonunion at one of the surgical

sites" and if further surgery was required, "the period of disability may . . . extend at

least 3-6 months."[124]

    In August 2007, Dr. Kline completed a lower extremities impairment

questionnaire listing the current diagnosis as subtalar joint nonunion, based on a June

2007 CT scan, which revealed incomplete fusion of the right subtalar joint.[125]  He

reported plaintiff suffered sharp and throbbing pain during ambulation and, while able to

---

[117] *Id.* at 959-989.
[118] *Id.* at 892-936 (showing prescriptions for Percocet and pain management referrals); *see also id.* at 954 (detailing Dr. Devotta's evaluation).
[119] *Id.* at 954-55.
[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] *Id.* at 957.
[124] *Id.*
[125] *Id.* at 815-22.

initially ambulate independently, could not sustain walking or other activities.[126]  Dr.

Kline noted plaintiff used a CAM walker and cane and could not climb stairs without a

handrail.[127]  Dr. Kline concluded plaintiff could sit for eight hours, walk or stand for one

hour, frequently lift between 0-20 lbs., occasionally lift 20-50 lbs., and never lift over 50

lbs.[128]  He also noted swelling of the right leg would require elevation above hip-level for

1-2 hours, twice daily.[129]  Dr. Kline indicated severe pain frequently interfered with

plaintiff's attention and concentration,[130] and denied any evidence of malingering.[131]  He

concluded plaintiff could tolerate low stress work, and required unscheduled work

breaks every two hours, with absenteeism of more than three times a month because of

the impairments.[132]  Dr. Kline's further work limitations identified avoiding temperature

extremes, kneeling, bending, and stooping.[133]

Plaintiff began treatment with Dr. Ivins in 2007.[134]  Like Dr. Kline, Dr. Ivins treated

the foot and ankle pain.[135]  At the November 1, 2007 appointment, plaintiff rated his

lower leg pain at 9/10.[136]  On March 3, 2008, plaintiff informed Dr. Ivins that his pain

level remained the same.[137]

On March 26, 2008, plaintiff complained to Dr. Kline of persistent pain in the right

ankle and along the outer aspect of his right foot, which turned inward during

---

[126] *Id.* at 817.
[127] *Id.* at 817-18.
[128] *Id.* at 817-19.
[129] *Id.*
[130] *Id.* at 820.
[131] *Id.*
[132] *Id.* at 820-21.
[133] *Id.*
[134] *Id.* at 1043,1045.
[135] *Id.* at 995-1061.
[136] *Id.* at 1043.
[137] *Id.* at 1039.

ambulation.[138]  Plaintiff advised the CAM walker provided more secure ambulation.[139]
Dr. Kline's examination found possible nonunion of the subtalar joint, ankle equinus, and
tenderness and tightness along the Achilles tendon.[140]  Based on these findings, Dr.
Kline recommended percutaneous tendo-Achilles lengthening to decrease
compensatory pronation at the subtalar joint, and to delay the nonunion repair because
the subtalar joint was presently not tender on motion.[141]

On March 31, 2008, plaintiff told Dr. Ivins the pain had not increased since his
last visit, for which 30 mg. Roxicodone was prescribed.[142]  Eleven days later, Dr. Kline
re-prescribed the same dosage.[143]

On April 22, 2008, plaintiff was admitted to Glasglow Medical Center for
percutaneous tendo-Achilles lengthening.[144]  On postoperative evaluation, Dr. Kline
noted improvement in ankle ROM, with pain well-controlled.[145]

In May 2008, Dr. Kline referred plaintiff to DYNAMIC Physical Therapy, where
treatment was provided by several different clinicians.[146]  On June 24, 2008, plaintiff
saw Sarah Price, MPT, about severe pain around the Achilles tendon and anterior and
medial ankle area and lateral numbness.[147]  On July 2, 2008, plaintiff informed
Christopher Goetz, PT, ("Goetz) that his right ankle pain decreased and ROM

---

[138] *Id.* at 973.
[139] *Id.*
[140] *Id.*
[141] *Id.*
[142] *Id.* at 1038.
[143] *Id.* at 936.
[144] *Id.* at 952.
[145] *Id.* at 976-77.
[146] *Id.* at 866.
[147] *Id.*

increased.[148]   One week later, however, plaintiff rated the severity of pain at 10/10.[149]

On July 11, 2008, Goetz reported plaintiff's overall condition was "improving," "with good

tolerance to [the] exercise program."[150]   On July 16, 2008, plaintiff stated he was

"improving" with physical therapy, and Rivada noted minimal complaints of pain or

difficulty.[151]   On July 17, 2008, plaintiff told Goetz he felt "pretty good with little pain,"

and his functional ability had improved more than 50% since starting physical therapy.[152]

On July 22, 2008, plaintiff reported increased walking was less painful.[153]   July 25, 2008

was his last physical therapy appointment, when he complained of soreness due to

exercise.[154]

On October 7, 2008, plaintiff underwent another surgical procedure on his right

foot at Glasglow Medical Center.[155]

On October 30, 2008, Dr. Kline reported plaintiff had decreased edema in the

right foot with mild residual erythema.[156]   Moreover, on November 13, 2008, Dr. Kline

noted plaintiff still experienced pain in the right foot, but his condition had improved.[157]

The doctor prescribed additional Roxicodone.[158]   The following day, plaintiff complained

to Dr. Ivins that his level of pain was at 8/10 and needed his prescriptions refilled.[159]   At

---

[148] *Id.* at 855.
[149] *Id.* at 850.
[150] *Id.* at 845.
[151] *Id.* at 838-38.
[152] *Id.* at 835-36.
[153] *Id.* at 832.
[154] *Id.* at 828, 826.
[155] *Id.* at 949 (the operation involved revision of the second digit proximal interphalangeal joint arthrodesis with K wire fixation and an exostectomy of the fifth metatarsal base).
[156] *Id.* at 984.
[157] *Id.* at 985.
[158] *Id.* at 926-27.
[159] *Id.* at 1032; *see also id.* at 927 (note from Dr. Kline to Dr. Ivins advising of the November 13, 2008 Roxicodone refill).

both his December 10 and December 30, 2008 appointments with Dr. Kline, plaintiff reported the pain was localized to the outer aspect of his right ankle after periods of ambulation.[160]  On December 12, 2008, plaintiff's chief complaint to Dr. Ivins was he needed further refills of his medications because of increased right foot and ankle pain due to cold weather.[161]

X-rays taken June 16, 2009 revealed joint space narrowing and osteophytes consistent with degenerative joint disease.[162]  Dr. Kline noted possible subtalar nonunion, but determined no surgery was necessary.[163]

Roughly a year later, Dr. Kline reported in a letter that plaintiff's condition remained consistent with the information contained in his 2007 lower extremities impairment questionnaire.[164]  Specifically, Dr. Kline concluded plaintiff suffered reduced ROM in his right subtalar and ankle joints, tenderness in the right sinus tarsi and plantar lateral heel, muscle atrophy in the right calf, swelling and sensory loss in the right foot and lower leg, joint instability and crepitus in the right subtalar joint, and an abnormal gait.[165]  Dr. Kline concluded plaintiff could not stand or walk for more than one hour in an eight hour work day, required elevation of his right leg above hip level for one to hours twice each day, and his condition would result in more than three absences from work per month.[166]  Lastly, Dr. Kline stated plaintiff's condition was ongoing and had existed

---

[160] *Id.* at 986.
[161] *Id.* at 1031.
[162] *Id.* at 988.
[163] *Id.*
[164] *Id.* at 890.
[165] *Id.*
[166] *Id.*

since May 25, 2006.[167]

Dr. Kline did not see plaintiff again until May 4, 2011, when plaintiff complained of a burning pain in his outer heel and along his right foot to the fourth and fifth digits, which had been present for over two weeks; he denied any injury to the affected area.[168] Dr. Kline's examination revealed mild residual edema on the lateral aspect of the foot.[169] Although Dr. Kline found no tenderness in the subtalar joint on attempted ROM, pinpoint tenderness was evident at the plantar fascial insertion site, and on palpation along the entire fascial band including submetatarsal VI and V.[170]  Dr. Kline noted no edema, erythema, calor, ecchymosis, or interspace neuroma, and a negative Mulder sign.[171] Assessment of recent radiographs of plaintiff's right foot confirmed the subtalar joint screw remained and no evidence of heel spurring.[172]  Based on these findings, Dr. Kline suspected plantar fasciitis for which he administered injections and recommended continued icing and elevation of the right leg, using his custom orthotics, and performing daily plantar fascia stretching exercises.[173]  He also recommended plaintiff return within three to four weeks if he remained symptomatic.[174]  This was plaintiff's last reported appointment with Dr. Kline.[175]

Plaintiff continued seeing Dr. Ivins regularly until August 2011.[176]  Dr. Ivins' records indicate that, from February 2009 onward, plaintiff's reported pain levels did not

---

[167] *Id.*
[168] *Id.* at 989.
[169] *Id.*
[170] *Id.*
[171] *Id.*
[172] *Id.*
[173] *Id.*
[174] *Id.*
[175] *Id.*
[176] *Id.* at 995.

rise above a 5/10 and he never complained of increased pain.[177]  In May 2011, Dr. Ivins completed a Multiple Impairment Questionnaire listing plaintiff's pain level as a 5/10 or moderate.[178]  In the questionnaire, Dr. Ivins identified plaintiff's primary symptoms as chronic foot and ankle pain exacerbated by weight bearing and "sensory changes of [the] area," which would likely increase in a competitive work environment, and would frequently interfere with concentration and attention.[179]  Dr. Ivins described plaintiff's pain as a "constant, deep pain, var[ying] in quality (sharp/dull), of a mechanical nature."[180]  Dr. Ivins further determined plaintiff suffered burning neuropathic pain which "was not completely relieved with medication without unacceptable side effects."[181]

In the context of an eight-hour work day, Dr. Ivins determined plaintiff was able to sit for four hours and stand or walk for one hour or less, with absences more than three times a month and unscheduled breaks every ten to fifteen minutes, each for a duration of at least fifteen minutes.[182]  Although no medical condition prevented continuous sitting, plaintiff should not stand or walk continuously.[183]  Dr. Ivins reported plaintiff could occasionally lift and carry up to ten pounds, but never more than that amount.[184]  He also noted no significant limitations in performing repetitive reaching, handling, fingering, or lifting, and no limitations with grasping, turning, or twisting objects, fine finger and hand manipulations, and arm reaching.[185]  He further concluded plaintiff's narcotic

---

[177] *Id.* at 995-1028.
[178] *Id.* at 1045-52.
[179] *Id.* at 1046, 1049-50.
[180] *Id.* at 1046.
[181] *Id.* at 1046-47.
[182] *Id.* at 1047-51.
[183] *Id.* at 1047-48.
[184] *Id.* at 1048.
[185] *Id.* at 1048-49.

medication caused mild psycho-motor impairment.[186]

### d.    Mental impairments

Plaintiff has also undergone evaluations and treatment for substance abuse
issues and various mental impairments, including social functioning issues,
concentration and memory deficits, depression, and episodes of decompensation.

### i.    Frederick Kozma Jr., Ph.D.

Plaintiff was referred to Frederick Kozma, Jr., Ph.D., ("Dr. Kozma") for evaluation
of his mental status.[187]   On January 23, 2006, Dr. Kozma conducted a Mini-Mental
Status Evaluation ("MMSE") and clinical interview.[188]   Upon plaintiff's arrival for the
appointment, Dr. Kozma noted plaintiff was "disheveled," walked with a cane and his
movements were "generally slow and awkward."[189]

Regarding his medical history, plaintiff related his right leg was amputated at age
eighteen due to a hunting accident, he suffered heart failure two years prior, and he was
blind in his right eye.[190]   Neither the record nor his representations to health care
providers support these statements.[191]   Plaintiff reported a number of recent deaths in
his family, and depression as evidenced by emotional lability, poor sleep, poor appetite,
and low energy.[192]   Plaintiff further claimed to experience "visual hallucinations" of his
dead relatives at night.[193]

---

[186] *Id.*
[187] D.I. 8 at 476-82.
[188] *Id.* at 476.
[189] *Id.* at 479.
[190] *Id.* at 476.
[191] *Id.*
[192] *Id.* at 476-77.
[193] *Id.* at 477.

Concerning family history, plaintiff reported a troubled childhood, and was raised by his grandparents from age seven because his mother abandoned him.[194]  Absent plaintiff's claim of his mother's mental instability, he was otherwise unaware of any other psychological problems in his family.[195]  Plaintiff related he was married at age eighteen, but the marriage ended seven years later.[196]  Plaintiff did not report any subsequent marriages, and denied having any children.[197]

Plaintiff reported that, although he attended special education classes, he received a high school diploma.[198]  Concerning employment, plaintiff claimed to have worked at a gas station for two years,[199] and his last full time job for fifteen years was cleaning up commercial hazardous waste.[200]  Plaintiff admitted quitting several jobs because of difficulties with co-workers.[201]  Plaintiff never served in the military.[202]

Plaintiff claimed he occasionally drank, and never experienced any blackouts or delirium tremens from alcohol use.  He denied using other substances.[203]  He admitted smoking cigarettes "occasionally."[204]  Regarding his criminal history, plaintiff related he had been arrested once for "petty theft as a child."[205]

During the evaluation, Dr. Kozma noted plaintiff was cooperative yet "somewhat

---

[194] *Id.*
[195] *Id.*
[196] *Id.*
[197] *Id.*
[198] *Id.*
[199] *Id.*
[200] *Id.*
[201] *Id.* at 478.
[202] *Id.*
[203] *Id.*
[204] *Id.*
[205] *Id.*

passive" because he "offered little information spontaneously."[206]  Dr. Kozma further

observed plaintiff comprehended test questions and materials without difficulty.[207]  He

found plaintiff's speech coherent and relevant, with a good vocabulary and a "variably

organized flow" of information.[208]  Dr. Kozma found plaintiff's insight and judgment was

fair.[209]

Plaintiff became tearful during the evaluation.[210]  Plaintiff advised that he cried

frequently and often thought about death, but denied he was suicidal.[211]  He also

complained of poor appetite, low energy, trouble sleeping, and hallucinations.[212]

Plaintiff claimed he often struggled with short-term memory,[213] as evidenced by

occasionally forgetting his telephone number or taking his medications, and getting lost

when traveling home from familiar locations.[214]  Nevertheless, Dr. Kozma found his

"general fund of information" was adequate.[215]

Plaintiff's MMSE score was a 20/30, which is classified as moderate cognitive

impairment.[216]  The MMSE results revealed he was partially-oriented.[217]  Although he

could recall the correct month, day of the week, and season, plaintiff could not

remember the date, year, and his location.[218]

---

[206] *Id.* at 479.
[207] *Id.* at 478.
[208] *Id.* at 479.
[209] *Id.*
[210] *Id.*
[211] *Id.*
[212] *Id.*
[213] *Id.*
[214] *Id.*
[215] *Id.*
[216] *Id.*
[217] *Id.*
[218] *Id.*

The evaluation results showed plaintiff's ability to register and recall information was good.  He repeated three out of three objects immediately, recalled three words after a brief delay, correctly named common objects, repeated phrases, wrote sentences, read and followed directions, and followed three-step-commands, but was unable to correctly copy a diagram of interlocking pentagons.[219]

Based on his evaluation, Dr. Kozma diagnosed Major Depressive Disorder, manifested by depressed mood, diminished interest and pleasure, low energy, sleep disturbance, poor appetite, thoughts of death, visual hallucinations, and diminished ability to think or concentrate.[220]  Dr. Kozma also noted plaintiff's financial management was poor.[221]

On February 5, 2006, Dr. Kozma completed a Psychological Functional Capacities Evaluation Form in connection with his evaluation of plaintiff for the Delaware Disability Determination Service ("DDS").[222]  The form required evaluating the degree of impairment from none to severe.[223]  Dr. Kozma rated plaintiff's ability to relate to other people as moderate, restriction of his daily activities as severe, deterioration of his personal habits as mild, and constriction of interests as severe.[224]  Using the same scale, Dr. Kozma rated plaintiff's degree of impairment within the competitive labor-

---

[219] *Id.*

[220] *Id.* at 480.

[221] *Id.*

[222] *Id.* at 481.  DDS is a state administered federal program that serves Delawareans who are unable to work due to a disability.  DDS is a state agency governed by the Social Security Administration. DDS develops, adjudicates and processes disability claims for Social Security disability benefits.

[223] *Id.; see also id.* at 482.  The DDS form defines "moderately severe" as "an impairment which seriously affects the ability to function; "moderate" as "an impairment which affects but does not preclude ability to function;" and "mild" as "suspected impairment of slight importance which does not affect ability to function.")

[224] *Id.*

market setting as none for understanding simple, primarily oral, instructions; was moderately severely impaired for carrying out instructions under ordinary supervision; and was severely limited for sustaining work performance and attendance, coping with work pressures, and performing routine, repetitive tasks under ordinary supervision.[225] Dr. Kozma's diagnosis was Major Depressive Disorder, without any chronic brain syndrome or psychotic disorder.[226]   He rated plaintiff's Global Assessment of Function ("GAF") score at 35.[227]

### ii.      D. Fugate, Ph.D.

On February 16, 2006, D. Fugate, Ph.D., ("Dr. Fugate") conducted a psychiatric review in connection with plaintiff's disability determination,[228] and found he suffered from depression.[229]   Dr. Fugate concluded plaintiff had mild functional limitation, which caused some restriction of daily living activities and some difficulty in social functioning, concentration, persistence, or pace, and would not experience decompensation of an extended duration.[230]

Based on his findings, Dr. Fugate concluded plaintiff's mental impairment was not severe, and he was mentally capable to perform routine work.[231]   Regarding Dr.

---

[225] *Id.* at 482.
[226] *Id.*
[227] The GAF is a scale ranging from zero to one hundred used by mental health professions to express an adult's psychological, social and occupational functions.  A GAF score of 61 to 70 indicates some mild symptoms or only some difficulty in social, occupational or educational functioning; a score of 51-60 indicates mild symptoms or moderate difficulty in social, occupational, or educational functioning; and a score of 41 to 50 suggests serious symptoms or serious impairment in social, occupational and educational functioning.  AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS-TEXT REVISION 34 (4th ed. 2000).
[228] *Id.* at 483.
[229] *Id.* at 486.
[230] *Id.* at 493.
[231] *Id.* at 483, 495.

Kozma's findings, Dr. Fugate pointed out that plaintiff may have "present[ed] himself in a manner that a lay person could be expected to act if he wanted the [examiner] to think that he was psychiatrically impaired,"[232] and noted several of his statements to Dr. Kozma were not credible because they conflicted with the medical record.[233]  Therefore, Dr. Fugate recommended Dr. Kozma's evaluation be accorded little weight.[234]

### iii.  Christiana Care

On June 30, 2006, plaintiff presented to the Christiana Care emergency room complaining of chest pain and suicidal thoughts.[235]  He related contemplating suicide after learning of his wife's infidelity,[236] and feared hurting himself or others because of his purported long history of poorly modulated anger impulsivity and behavioral dyscontrol.[237]

The mental status examination described plaintiff as cooperative and polite, with speech of normal rate and volume.[238]  He was moderately tremulous with no ataxia.[239]  His thought processes were logical and his associations intact.[240]  Plaintiff described his mood as depressed, which the examination confirmed.[241]  He expressed suicidal and homicidal ideation, and his thought content was characterized by feelings of

---

[232] *Id.* at 495.
[233] *Id.*
[234] *Id.*
[235] *Id.* at 505.
[236] *Id.* The record is unclear whether plaintiff is married because the alleged infidelity concerned his second wife of five years.  *Id.*  Six months earlier, plaintiff told Dr. Kozma he had been married only once and the marriage ended after seven years.  In a consultation report from his June/July 2006 hospitalization, plaintiff reported he had one daughter in college, which is inconsistent with his responses during his January 2006 evaluation by Dr. Kozma where he claim to have no children.  D.I. 8 at 512.
[237] *Id.* at 505.
[238] *Id.* at 506.
[239] *Id.*
[240] *Id.*
[241] *Id.*

hopelessness, helplessness, and worthlessness.[242]  The examination revealed no evidence of hallucinations or delusions,[243] and found plaintiff was alert, oriented, and his memory intact.[244]  His intellectual functioning was within the average range, and his abstract reasoning was "concrete."[245]  The examination reported plaintiff's attention span was impaired, and his judgment poor due to impulsivity and substance abuse.[246]

In relating his history, plaintiff denied treatment for depression and admitted to self-medicating with alcohol,[247] by drinking between six and twenty-four cans of beer daily.[248]  Plaintiff, however, later claimed to consume only two or three beers per day.[249]  Plaintiff admitted to episodic cocaine abuse,[250] which was confirmed through lab tests positive for cocaine and benzodiazepines.[251]  However, it was difficult for the examiners to determine whether plaintiff was also abusing prescribed medications.[252]

Plaintiff was admitted to the Psychiatric Unit for individual, group, and adjunctive therapy.[253]  Although he gradually reported less emotional dyscontrol and diminished suicidal ideation, he continued to express concern about his impulsivity and possible future violent or suicidal behavior.[254]  The hospital discharge summary states there was obvious improvement within the first week after admission,[255] as evidenced by his

---

[242] *Id.*
[243] *Id.*
[244] *Id.*
[245] *Id.*
[246] *Id.*
[247] *Id.* at 505.
[248] *Id.*
[249] *Id.* at 512.
[250] *Id.*
[251] *Id.* at 506.
[252] *Id.* at 505.
[253] *Id.* at 506.
[254] *Id.*
[255] *Id.* at 507.

"significant progress" and good participation in group therapy.[256]  He was more energetic

and optimistic, and his level of depression diminished, with no evidence of suicidal

ideation.[257]  Plaintiff was discharged on July, 7, 2006.[258]  In terms of follow-up, plaintiff

advised he would continue treatment at the Open Door Counseling Program, and with

alcoholics anonymous.[259]

Plaintiff was treated by Michael N. Marcus, M.D., of Christiana Care's Department

of Psychiatry on two occasions in October and November 2006,[260]  who diagnosed

recurrent, severe major depression of a psychotic nature, PTSD, alcohol dependence,

anger, irritability, and explosiveness.  Treatment was via medication.[261]

### iv.    Glen D. Greenberg, Ph.D., ABPP

On September 19, 2006, plaintiff saw Glen D. Greenberg, Ph.D., ABPP, ("Dr.

Greenberg") of The Neuroscience Institute of Delaware, who noted depressed mood,

clear and fluent speech, and organized, logical thoughts.[262]  His mental status exam

revealed orientation as to date, ability to memorize two of three words after a distracter,

significantly impaired serial sevens, and difficulty with subtraction.[263]  Plaintiff scored a 35

on the Beck Depression Inventory II, which is in the severe range.[264]  On a Post-

Traumatic Stress Disorder ("PTSD") screening measure, plaintiff related witnessing the

9/11 terrorist attack in New York City, with other moderate to severe symptoms

---

[256] *Id.* at 540.
[257] *Id.* at 507.
[258] *Id.* at 505.
[259] *Id.* at 507.
[260] D.I. 9 at 605.
[261] *Id.*
[262] *Id.* at 804-05.
[263] *Id.* at 805.
[264] *Id.* at 805, 807-08.

associated with the event.[265]  Dr. Greenberg diagnosed adjustment reaction with depression, PTSD, alcohol and polysubstance abuse, and rule out ("R/O") major depression and antisocial personality disorder.[266]  Dr. Greenberg concluded plaintiff remained at risk for suicide and recommended individual counseling, couples therapy, and a possible referral to the University of Pennsylvania for severe PTSD treatment .[267]

### v.    Maurice Prout, Ph.D.

Maurice Prout, Ph.D., ("Dr. Prout") completed a Social Security Administration Psychiatric Review Technique form on February 23, 2007, identifying plaintiff's personality and substance addiction disorders as "not severe."[268]  He found mild limitation of activities of daily living, and in maintaining social functioning, concentration, persistence, and pace.[269]  Dr. Prout estimated plaintiff would experience between one and two episodes of decompensation, each of extended duration.[270]  It is unclear whether Dr. Prout's evaluation was the result of direct observation or review of the record.

### vi.    Brian Simon, Psy. D.

Brian Simon, Psy.D., ("Dr. Simon") examined plaintiff on February 5, 2007 for his disability determination.[271]  Dr. Simon's behavioral observations were as follows:  a strong smell of alcohol; fair attention and concentration; speech with normal rate, volume, and articulation; poor memory; errors in performing serial calculations; limited

---

[265] *Id.* at 805, 809.
[266] *Id.*
[267] *Id.* at 805-06.
[268] *Id.* at 776.
[269] *Id.* at 786.
[270] *Id.*
[271] *Id.* at 767.

abstraction ability; constricted affect; and no evidence of significant pain and limited ambulation despite a boot on his foot.[272]  After conducting a clinical interview, Dr. Simon's diagnostic impression was malingering, alcohol abuse, antisocial personality disorder, and a GAF score of 45, and he recommended outpatient psychiatric and substance abuse treatment.[273]

On the psychological functional capacities evaluation form, Dr. Simon noted moderate impairment in restriction of daily activities and constriction of interests, mild to moderate impairment to relate to people, and moderately severe impairment in the deterioration of personal habits.[274]  In the competitive labor-market, Dr. Simon reported mild impairment in understanding simple, primarily oral instructions, and moderate impairment in carrying out instructions, sustaining work performance, attendance in a normal work-setting, coping with pressures of ordinary work, and performing routine, repetitive tasks under ordinary supervision.[275]  Dr. Simon further concluded plaintiff was incapable of handling his finances.[276]

### vii.    Seth Ivins, M.D.

As previously discussed, plaintiff began treatment with Dr. Ivins as his primary care physician in April 2007.[277]  While treatment notes indicate the majority of visits concerned foot and ankle concerns, the doctor occasionally prescribed medication for

---

[272] *Id.*
[273] *Id.* at 768-69.
[274] *Id.* at 770.
[275] *Id.* at  771.
[276] *Id.* at 772.
[277] *See id.* at 1054.

29

mental impairments.[278]

On a Psychiatric/Psychological Impairment Questionnaire dated May 6, 2011, Dr.

Ivins diagnosed plaintiff's condition as bipolar disorder I with psychotic features,[279] with a

current GAF score of 60.[280]  Dr. Ivins noted the primary symptoms included "mood lability

with difficulty functioning in normal social situations and periods of psychosis, both drug

and non-drug induced."[281]

Dr. Ivins' evaluation of plaintiff's restrictions in a competitive work environment

found moderate limitation to remember locations, work procedures and one or two step

instructions,[282] and marked limitation to understand and remember detailed

instructions.[283]  He noted mild limitation in completing simple one or two step instructions,

avoiding hazards, traveling to unfamiliar places or using public transportation; moderate

limitation in setting realistic goals, independent planning, sustaining an ordinary routine

without supervision, performing within a schedule, maintaining regular and punctual

attendance; and marked limitation in carrying out detailed instructions, maintaining

attention/concentration for extended periods, and working with or in proximity to

others.[284]  Dr. Ivins reported unpredictable episodes of decompensation, accompanied

by hostile, aggressive, and inappropriate behavior.[285]

While Dr. Ivins indicated plaintiff was taking Seroquel XR, Cymbalta, and Xanax,

---

[278] *See generally* D.I. 9 at 995-1043 (checking "no anxiety or depression" and occasionally noting "mania").  *But see id.* at 1028 (noting presence of anxiety or depression and prescribing Cymbalta).
[279] *Id.* at 1054-61.
[280] *Id.* at 1054.  Dr. Ivins noted the lowest GAF score in the past year was 30.
[281] *Id.* at 1056.
[282] *Id.* at 1057.
[283] *Id.*
[284] *Id.*
[285] *Id.* at 1059.

he recorded no side effects.[286]  He found no evidence of malingering or reduced

intellectual functioning,[287] and estimated plaintiff's impairments would cause absences

from work more than three times a month.[288]  Dr. Ivins ultimately determined plaintiff

could perform low stress work, but cautioned even low level stressors were likely to

exacerbate his condition during episodes of decompensation or hypomania.[289]

### C.      The Administrative Law Hearing

#### 1.      Testimony of Plaintiff

Plaintiff testified he has been treating with Dr. Goldberg for approximately three

years, with office visits every six to eight months and if a problem arises.[290]  His present

medications include blood thinners and for treatment of hypertension and elevated

cholesterol.[291]  He related undergoing two catherization procedures.[292]

Plaintiff claimed to experience chest pain either daily or every other day, which is

primarily triggered by stress and overexertion from household activities, but also occurs

occasionally at rest.[293]  His chest pain lasts from fifteen to twenty seconds and is relieved

with nitroglycerin.[294]

Plaintiff testified his episodes of chest pain are accompanied by shortness of

breath, which lasts for twenty minutes.[295]  Exertion also triggers shortness of breath,

---

[286] *Id.* at 1057.
[287] *Id.* at 1060.
[288] *Id.* at 1060-61.
[289] *Id.* at 1059.
[290] *Id.* at 1152.
[291] *Id.*
[292] *Id.*
[293] *Id.* at 1153.
[294] *Id.*
[295] *Id.* at 1154.

which he experiences while showering, cleaning, bending over, and sitting up.[296]

Plaintiff claimed he essentially does no daily living activities.[297]  He denied doing any household chores, and his girlfriend cooks and does his laundry.[298]  Plaintiff  testified his driving is limited to doctor's appointments.[299]

Regarding problems with his right calf, ankle, and foot, he claims to sit in a recliner with his leg wrapped in an ice-pack and elevated at waist-level for most of the day to minimize pain and swelling.[300]  He walks for about ten to fifteen minutes every few hours when his leg becomes numb.[301]  Plaintiff used a cane at the hearing, which he claims to need for walking and stability.[302]

Plaintiff testified he sleeps between four and five hours each night,[303] but awakens frequently because of his medications.[304]  As a result, he feels tired and "run down" during the day.[305]  Plaintiff claimed difficulty with concentration and memory.[306]

Regarding medication side effects, plaintiff testified nitroglycerin causes severe headaches, which last about fifteen minutes,[307] and narcotic medications cause nausea for an hour after ingestion.[308]

Plaintiff admitted his doctor strongly recommended he quit smoking,[309] which he

---

[296] *Id.*
[297] *Id.*
[298] *Id.* at 1156.
[299] *Id.* at 1157.
[300] *Id.* at 1155-56.
[301] *Id.* at 1155.
[302] *Id.* at 1156, 1159.
[303] *Id.* at 1157.
[304] *Id.*
[305] *Id.*
[306] *Id.* at 1158.
[307] *Id.* at 1153-54.
[308] *Id.* at 1158.
[309] *Id.*

did six to eight weeks prior to the hearing.[310]

### 2.    Testimony of Vocational Expert

Christina Beatty-Cody, a vocational expert, also testified at the administrative

hearing.[311]  The ALJ referenced the prior vocational expert's testimony concerning

plaintiff's past relevant work, which included employment as a heavy equipment

operator, classified medium and skilled, and a tree cutter helper, rated as heavy and

unskilled, with the skills from this prior work not transferable.[312]  The hypothetical person

the ALJ presented was a individual age 41 years, with a 12th grade education, who is

able to read, write and perform simple math, including addition and subtraction, is

sedentary, but could stand and walk for about two hours in an eight hour work day.

Based on the limitations in Dr. Kline's Lower Extremities Impairment

Questionnaire, Beatty-Cody responded to the ALJ's hypothetical that plaintiff's pain,

fatigue, and other symptoms were severe enough to interfere with concentration, and

would reduce his productivity by 15 to 20 percent or more.[313]  She further noted plaintiff

could not tolerate low stress jobs,[314] and his symptoms would cause more than three

absences per month, which are work preclusive.[315]

In response to plaintiff's counsel's question of how his client's use of a cane and

the need to elevate his right leg twice a day for one to two hours would affect working,

---

[310] *Id.*
[311] *Id.* at 1160.
[312] *Id.*
[313] *Id.* at 1162; *see also id.* at 815-22 (Dr. Kline's 2007 Lower Extremities Impairment Questionnaire); *see also id.* at 890 (Dr. Kline's 2010 letter stating his medical opinion remained consistent with his responses in the 2007 questionnaire).
[314] *Id.*
[315] *Id.*

Beatty-Cody responded if such elevation occurred at work, and not during a break, it would be work preclusive.[316]

### D.      The ALJ's Decision

Based on the evidence and testimony, the ALJ determined in her December 2, 2011 opinion,[317] that plaintiff was not disabled, and not entitled to DIB.[318]  The ALJ's findings are summarized as follows:

1.      The claimant meets the insured status requirements of the Social Security Act through March 31, 2007.[319]

2.      The claimant has not engaged in substantial gainful activity since September 30, 2004, the alleged onset date (20 CFR 404.1571 *et. seq.*, and 416.971 *et. seq.*).[320]

3.      The claimant has the following severe impairments:  posterior tibial tendon disorder, status post gunshot wound, substance addiction disorder, and depression (20 CFR 404.1520(c) and 416.920(c)).[321]

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925, and 416.926).[322]

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except that he is limited to occasional postural activities. In addition, the claimant must avoid temperature and humidity extremes and can never climb ropes, ladders or scaffolds.  Due to the claimant's mental impairment, the claimant is limited to simple,

---

[316] *Id.* at 1163.
[317] D.I. 8 at 24-37.
[318] *Id.* at 37.
[319] *Id.* at 26.
[320] *Id.*
[321] *Id.* at 27.
[322] *Id.* at 28.

unskilled work that is not at a production pace.[323]

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[324]

7.  The claimant was born March 7, 1963 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  The claimant subsequently changed age category to a younger individual, age 45-49 (20 CFR 404.1563 and 416.963).[325]

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).[326]

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).[327]

10.  Considering the claimant's age, education, work experience, and residual functioning capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[328]

11.  The claimant has not been under a disability, as defined in the Social Security Act, from September 30, 2004, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).[329]

## III.  JURISDICTION

A district court's jurisdiction to review an ALJ's decision regarding disability benefits is controlled by 42 U.S.C. § 405(g).  The Commissioner's decision becomes final when the Appeals Counsel affirms an ALJ opinion, denies review of an ALJ

---

[323] *Id.* at 30.
[324] *Id.* at 36.
[325] *Id.*
[326] *Id.*
[327] *Id.*
[328] *Id.*
[329] *Id.* at 37.

decision, or when a claimant fails to pursue available administrative remedies.[330]  In the instant matter, the Commissioner's decision became final when the Appeals Counsel affirmed the ALJ's denial of benefits.  Thus, this court has jurisdiction to review the ALJ's decision.

## IV.   PARTIES' CONTENTIONS

### A.   Plaintiff's Contentions

Plaintiff urges remand because the ALJ:  (1) failed to follow the treating physician's rule; (2) failed to properly evaluate his credibility; and (3) erred by finding he could perform other work.[331]

First, plaintiff contends the ALJ failed to accord proper weight to the medical opinions of treating physicians, Drs. Kline and Ivins.  The ALJ refused to give controlling weight to the treating physicians' opinions to the extent they conflicted with plaintiff's RFC, reasoning they are "not well supported by medical signs and laboratory findings and are inconsistent with detailed, contemporaneous treatment records."[332]  Plaintiff alleges the ALJ failed to cite:  (1) the specific medical records on which she relied as the basis for finding the opinions inconsistent; (2) any other substantial evidence in contradiction of the opinions; and (3) evidence from the record to support her RFC determination.[333]  Plaintiff cites 20 C.F.R. § 404.1527(c)(2), which provides the Commissioner will give controlling weight to a treating source's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is

---

[330] *Aversa v. Sec'y of Health & Human Serv.*, 672 F. Supp. 775, 777 (D.N.J. 1987); *see also* 20 C.F.R. § 404.905 (2002).
[331] D.I. 12 at 6.
[332] D.I. 8 at 33.
[333] D.I. 12 at 19-20.

not inconsistent with other substantial evidence in . . . the case record."[334]   Plaintiff

maintains the opinions of Drs. Kline and Ivins are well-supported by clinical and

diagnostic findings, and therefore, deserve controlling weight.[335]   He further contends

even if controlling weight was not required, the ALJ failed to indicate what weight was

afforded and to address necessary factors under 20 C.F.R. § 404.1527(c)(2)-(6).[336]

Second, plaintiff asserts the ALJ improperly assessed his credibility.[337]   Under the

two-step credibility process, the ALJ  found his statements concerning intensity,

persistence, and the limiting effects of his symptoms as "not credible to the extent they

are inconsistent with the above residual functional capacity assessment."[338]   Plaintiff relies

on SSR 96-7p, which requires an ALJ to determine credibility "based on a consideration

of the entire case record."[339]   Plaintiff contends the ALJ erred by evaluating the

consistency of his statements against her own RFC, rather than against the record

evidence.[340]   In support, he references a recent Seventh Circuit decision, *Bjornson v.

Astrue*, which found that an ALJ's application of her determination of a claimant's ability to

work in determining credibility "gets things backwards."[341]

Lastly, plaintiff asserts the ALJ erred in finding he could perform other work.[342]

Plaintiff contends the ALJ improperly relied on the VE testimony from the March 2008

hearing, which is outside of the record before this court and inconsistent with the Appeals

---

[334] *Id.* at 17; *see also*  20 C.F.R. §§  404.1527(c)(2), 416.927(c)(2).
[335] D.I. 12 at 19.
[336] *Id.; see also* 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).
[337] D.I. 12 at 21.
[338] *Id.; see also* D.1. 8 at 31.
[339] D.I. 12 at 21.
[340] *Id.*
[341] *Id.* at 22; *see also Bjornson v. Astrue*, 671 F.3d, 640, 645-46 (7th Cir. 2012).
[342] D.I. 12 at 22.

Council's order of remand for the ALJ to obtain additional VE testimony.[343]  Plaintiff claims

the ALJ's hypothetical at the first hearing did not accurately describe his recognized

mental limitations.[344]

**B.    Defendant's Contentions**

Defendant maintains the ALJ's decision was based on substantial evidence in the

record, and, accordingly, should be affirmed because the ALJ:  (1) properly weighed the

medical opinions of Drs. Kline and Ivins; (2) appropriately assessed plaintiff's credibility;

and (3) reasonably relied upon VE testimony from the first hearing in concluding he could

perform other work in the national economy.

Defendant contends substantial evidence supports the ALJ's finding that Drs. Kline

and Ivins's opinions warranted less weight.[345]  Regarding Dr. Kline's 2010 letter affirming

his earlier opinion, defendant argues the document cannot be afforded controlling weight

because it was drafted by plaintiff's counsel and presented to Dr. Kline only for his

signature; plaintiff's counsel is not an "acceptable medical source" under the regulations;

and the opinion is not based on any recent medical records because the letter was signed

in June 2010, and Dr. Kline's last contact with plaintiff was June 2009.[346]  Defendant

further maintains Dr. Kline's opinions are of little probative value, and accuses him of

merely documenting limitations for litigation purposes and adopting an "advocacy role" in

plaintiff's application for benefits.[347]

Defendant also asserts the ALJ cited adequate evidence to explain her

---

[343] *Id.* at 23.
[344] *Id.* at 24.
[345] D.I. 20 at 12-16.
[346] *Id.* at 13.
[347] *Id.*

determination that Drs. Kline and Ivins' opinions warranted less weight, because their opinions contradict each other; are inconsistent with their respective progress notes; and constitute "mere checkbox forms."[348]  Defendant relies on *Mason v. Shalala,* wherein the Third Circuit recognized checkbox forms as weak evidence.[349]

Defendant argues the ALJ adequately assessed and explained her conclusions regarding plaintiff's credibility,[350] as evidenced by his inconsistent statements throughout the record, including his drug and alcohol usage and low earnings.[351]

Lastly, defendant asserts the ALJ properly determined plaintiff could perform other work that exists in the national economy, arguing she reasonably relied upon VE testimony from the first hearing as evidence of employability.[352]  Accordingly, the record does not support all limitations suggested by Dr. Kline; therefore, the ALJ properly did not rely on the VE testimony from the 2008 hearing.[353]  Defendant additionally maintains the ALJ adequately accommodated plaintiff's moderate restrictions in concentration and social functioning, because she limited him to unskilled non-production pace jobs.[354] Defendant relies on 20 C.F.R. § 404, subpt. P, app. 2 § 202.00(g), which recognizes the primary work functions for unskilled work relates "to working with things," rather than people.[355]

## V.    STANDARD OF REVIEW

---

[348] *Id.* at 14-15.
[349] *Id.* at 14; *see also Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).
[350] D.I. 20 at 16-20.
[351] *Id.* at 17 (list of inconsistent statements throughout the record).
[352] *Id.*
[353] *Id.* at 21.
[354] *Id.*
[355] *Id. See also* 20 C.F.R. § 404, subpt. P, app. 2 § 202.00(g) (discussing primary functions of unskilled work in the context of illiteracy or inability to communicate in English).

## A.    Summary Judgment

In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the nonmoving party[,]' but [refraining from] weighing the evidence or making credibility determinations."[356]  If there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate.[357]

This standard does not change merely because there are cross-motions for summary judgment.[358]  Cross motions for summary judgement

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[359]

"The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party."[360]

## B.    ALJ's Findings

This court's review is limited to determining whether the final decision of the Commissioner is supported by substantial evidence.

> Substantial evidence is less than preponderance but more than a mere scintilla.  It is such relevant evidence as a reasonable mind would accept as adequate support for conclusion.  It must do more than create a suspicion of the existence of a fact to be established . . . it must be enough to justify, if the trial were put to a jury, a refusal to direct a verdict when the conclusion sought to drawn from it is one of fact to the jury.[361]

---

[356] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).
[357] *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(c)).
[358] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).
[359] *Rains v. Cascade Indus., Inc.*, 404 F.2d 241, 245 (3d Cir. 1968).
[360] *Krupa v. New Castle Cnty.*, 732 F. Supp. 497, 505 (D. Del. 1990).
[361] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).

The United States Supreme Court has embraced a similar standard for determining summary judgment pursuant to FED. R. CIV. P. 56:

> The inquiry performed is the threshold inquiry of determining whether there is a need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party . . . This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.  If reasonable minds could differ as to the import of evidence, however, a verdict should not be directed. [362]

Overall, this test is deferential, and a court must give deference to agency inferences, if supported by substantial evidence, even where acting *de novo*, the court might have reached a different result.

The evidence, taken as a whole, must be sufficient to support a conclusion by a reasonable person.  The ALJ cannot ignore or fail to resolve conflicts created by countervailing evidence.  Evidence is not substantial if it is overwhelmed by other evidence, such as that provided by treating physicians, or is merely conclusory.[363]

When countervailing evidence consists primarily of the claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record."[364]

## VI.    DISCUSSION

### A.      Disability Determination

---

[362] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (citations omitted).
[363] *Monsour Med. Ctr. v . Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).
[364] *Matullo v. Brown*, 926 F.2d 240, 245 (3d Cir. 1990).

Title II of the Social Security Act, 42 U.S.C. § 423(a)(l)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability."[365]  In order to qualify for DIB, a claimant must establish he was disabled prior to the date he was last insured.[366]  A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[367]

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.[368]  If a finding of disability or non-disability can be made at any point in the sequential process, the review ends.[369]  At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity.  If the claimant is so engaged, a finding of non-disabled is required.[370]  If the claimant is not so engaged, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe.  If the claimant is not suffering from either, a finding of non-disabled is required.[371]

If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listings") that are

---

[365] *Bowen*, 482 U.S. at 140.
[366] 20 C.F.R. § 404.131.
[367] 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).
[368] 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).
[369] 20 C.F.R. § 404.1520(a)(4).
[370] 20 C.F.R. § 404.1520(a)(4)(i).
[371] 20 C.F.R. §404.1520(a)(4)(ii).

presumed severe enough to preclude any gainful work.[372]  When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled.[373]  If a claimant's impairment, either singularly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five.[374]  At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work.[375]  A claimant's RFC is what "an individual is still able to do despite the limitations caused by [his] impairment(s)."[376]  "The claimant bears the burden of demonstrating an inability to return to [his] past relevant work."[377]

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work.[378]  At this last step, the burden rests with the Commissioner to show the claimant is capable of performing other available work existing in significant national numbers and consistent with the claimant's medical impairments, age, education, past work experience and RFC before denying disability benefits.[379]  In making this determination, the ALJ must analyze the cumulative effect of all the claimant's impairments, and often seeks the assistance of a vocational expert.[380]

## B.    Medical Opinions of Drs. Kline & Ivins

---

[372] 20 C.F.R. § 404.1520(a)(4)(iii); *see also Plummer*, 186 F.3d at 428.
[373] 20 C.F.R. § 404.1520(a)(4)(iii).
[374] 20 C.F.R. § 404.1520(e).
[375] 20 C.F.R.. § 404.1520(a)(4)(iv); *see also Plummer*, 186 F.3d at 428.
[376] *Fargnoli*, 247 F.3d at 40.
[377] *Plummer*, 186 F.3d at 428.
[378] *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *see also Plummer*, 186 F.3d at 428.
[379] *See id.*
[380] *See id.*

Plaintiff contends the ALJ improperly weighed the medical opinions of treating physicians, Drs. Kline and Ivins.[381]  An ALJ "evaluate[s] every medical opinion [she] receives."[382]  20 C.F.R. § 404.1527(c)(2) provides generally for more weight to be afforded to treating sources because they often are able to provide "a detailed longitudinal picture" of the claimant's medical impairments, not available from "objective findings alone" or individual medical reports; and if their opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record," they are given controlling weight. [383]

An ALJ may reject a treating physician's opinion "only on the basis of contradictory medical evidence."[384]  In those instances, "[e]ven where there is contradictory medical evidence, . . . and an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must still carefully evaluate how much weight to give the treating physician's opinion."[385]  An ALJ's decision not to give a treating physician's opinion controlling weight "must not automatically become a decision to give a treating physician's opinion no weight whatsoever."[386]

If the ALJ does not give the treating source's opinion controlling weight, the "[t]reating source medical opinions are still entitled to deference"[387] and must be weighed using the following factors:[388]  length of treatment relationship and the frequency of

---

[381] D.I. 12 at 17-20.
[382] 20 C.F.R. § 404.1527(c).
[383] *Id.* § 404.1527(c)(2).
[384] *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000).
[385] *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del.2008).
[386] *Winters v. Colvin*, C.A. No. 09-460-CJB, 2013 WL 5956246, at *18 (D. Del. Nov. 7, 2013) (quoting *Gonzalez*, 537 F. Supp. 2d at 660)
[387] SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996).
[388] *Id.*

examination;[389] nature and extent of the treatment relationship;[390] support with the relevant medical evidence;[391] consistency with the record as a whole;[392] specialization;[393] and other factors which tend to support or contradict the opinion.[394]

The Third Circuit has stated that "[a]lthough we do not expect the ALJ to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records, we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."[395]

In *Burnett v. Comm'r of Soc. Sec. Admin.*, the appellate court found the ALJ erred by failing "to consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination."[396] Although the ALJ may determine credibility, she must identify the rejected evidence and explain her reasons for discounting it.[397] As the Third Circuit noted, "[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."**[398]**

Here, the ALJ refused to accord Drs. Kline and Ivins' medical opinions controlling

---

[389] *Id.* § 404.1527(c)(2)(i).
[390] *Id.* § 404.1527(c)(2)(ii).
[391] *Id.* § 404.1527(c)(3).
[392] 20 C.F.R. § 404.1527(c)(4).
[393] *Id.* § 404.1527(c)(5).
[394] *Id.* § 404.1527(c)(6).
[395] *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2000).
[396] *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted). *See also Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (clarifying *Burnett*) ("*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review.").
[397] *Burnett,* 220 F.3d at 121.
[398] *Id.* (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

weight "to the extent that they are inconsistent with the residual functional capacity as determined."[399]   The ALJ's justifications are the opinions "are not well supported by medical signs and laboratory findings" and are "inconsistent with detailed, contemporaneous treatment records."[400]

While the ALJ was not bound by the physicians' opinions based solely on their status as treating sources, her findings must be based on substantial evidence in the record, and her reasoning should be sufficiently explained so this court does not have to guess regarding the evidence on which she relied.[401]   Although she summarized parts of the medical record after deeming both treating sources' opinions "uncontrolling," the ALJ failed to apply the required factors under § 404.1527(c)(2)-(6), and explain the weight given to either opinion.[402]

Defendant contends the ALJ was not obligated to adopt either physicians' opinion because plaintiff's counsel drafted Dr. Kline's 2010 letter for his review and signature, and the opinions were checkbox forms prepared for the purpose of litigation.[403]   Defendant further notes gaps in treatment, internal inconsistencies within the opinions, and contradictions between the opinions and the record.[404]   These comments are merely attorney argument as to why Drs. Kline and Ivins' opinions were not afforded controlling

---

[399] D.I. 8 at 33; *see also id.* at 30-31(defining plaintiff's RFC as "claimant has the residual functional capacity to perform sedentary work . . . , except that he is limited to occasional postural activities.  In addition, the claimant must avoid temperature and humidity extremes and can never climb ropes, ladders, or scaffolds.  Due to the claimant's mental impairment, the claimant is limited to simple, unskilled work that is not at a production pace.").

[400] *Id.* at 33.

[401] *See Burnett,* 220 F.3d at 121.

[402] D.I. 8 at 31-35; *see also id.* at 32 (acknowledging the required factors, but citing incorrect provisions).

[403] D.I. 20 at 12.

[404] *Id.* at 14-16.

weight in absence of appropriate reasoning by the ALJ.  As this court has recognized:

> [i]t is not for Commissioner to make an after-the-fact argument in support of the ALJ's decision. The analysis in Commissioner's brief cannot substitute for the ALJ's analysis.  Thus, these arguments can have no bearing on this Court's decision.  The ALJ therefore did not offer any sufficient basis for assigning [the physician's] opinion "little weight."[405]

Accordingly, the issue is remanded to the ALJ to apply the factors in 20 C.F.R. § 404.1527(c)(2)-(6) to explain why Drs. Kline and Ivins' opinions were not given controlling weight, and to provide the bases for the weight assigned to each treating sources' opinions.

### B.    Plaintiff's Credibility

Plaintiff argues the ALJ erred in evaluating the credibility of his subjective complaints.[406]  In evaluating symptoms, the ALJ must "consider all symptoms, including pain, and the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence."[407]

The regulations describe a two-step process for evaluating symptoms.[408]  First, the ALJ must consider whether a "medically determinable impairment" exists that "could reasonably be expected to produce" the alleged symptoms.[409]  Second, the ALJ must evaluate the intensity and persistence of symptoms to determine the effect on capacity to work.[410]  Under this evaluation, a variety of factors are considered, such as:  (1) "objective

---

[405] *Griffies v. Astrue,* 855 F. Supp. 2d 257, 272 (D. Del. 2012) (internal citation omitted).
[406] D.I. 12 at 20.
[407] 20 C.F.R. § 404.1529(a).
[408] SSR 96-7p (1996).
[409] 20 C.F.R. § 404.1529(b).
[410] *Id.* § 404.1529(c).

medical evidence,"[411] (2) "daily activities,"[412] (3) "location, duration, frequency and

intensity" of symptoms,[413] (4) "precipitating and aggravating factors,"[414] (5) medication

prescribed for symptoms, including its effectiveness and side effects,[415] (6) treatment,[416]

and (7) other measures used to relieve symptoms.[417]  In determining capacity to perform

basic work, the ALJ evaluates the claimant's statements about intensity, persistence, and

limiting effects of symptoms in relation to the record as a whole.[418]  To assess the

credibility of a claimant's statements, the ALJ "must consider the entire case record and

give specific reasons for the weight given to the individual's statements."[419]  Social

Security Ruling 96-7p clarifies the ALJ's obligations under the regulations:

> The reasons for the credibility finding must be grounded in the evidence and
> articulated in the determination or decision. It is not sufficient to make a
> conclusory statement that . . .  "the allegations are (or are not) credible." . . .
> The determination or decision must contain specific reasons for the finding
> on credibility, supported by the evidence in the case record, and must be
> sufficiently specific to make clear to the individual and to any subsequent
> reviewers the weight the [ALJ] gave to the individual's statements and the
> reasons for that weight. This documentation is necessary in order to give
> the individual a full and fair review of his or her claim, and in order to ensure
> a well-reasoned determination or decision.[420]

Here, while the ALJ conceded plaintiff's "medically determinable impairments could

reasonably be expected to cause the alleged symptoms," she found his statements

concerning the intensity, persistence, and limiting effects of his symptoms "not credible to

---

[411] *Id.* § 404.1529(c)(2).
[412] *Id.* § 404.1529(c)(3)(i).
[413] *Id.* § 404.1529(c)(3)(ii).
[414] *Id.* § 404.1529(c)(3)(iii).
[415] *Id.* § 404.1529(c)(3)(iv).
[416] *Id.* § 404.1529(c)(3)(v).
[417] *Id.* § 404.1529(c)(3)(vi).
[418] *Id.* § 404.1529(c)(4).
[419] SSR 96-7p (1996).
[420] SSR 96-7p (1996).

the extent they are inconsistent with the above [RFC] assessment."[421]   Plaintiff contends

the ALJ failed to consider the factors outlined in § 404.1529 and incorrectly evaluated the

credibility of his statements against the ALJ's own RFC determination, rather than against

the record as a whole.[422]

Plaintiff relies on *Bjornson v. Astrue*,[423]  where the Seventh Circuit criticized the

same language used by the ALJ in basing credibility on RFC as "boilerplate language"

and putting "the cart before the horse."[424]  Yet, the Seventh Circuit has since recognized

"[i]f the ALJ has otherwise explained his [or her] conclusion adequately, the inclusion of

this language can be harmless."[425]  While "[i]t would have been preferable for the ALJ to

explicitly go through the SSR 96–7p analysis,"[426] she nevertheless articulated reasons to

support her negative credibility determination, including instances of malingering,

substance abuse, reports of mild-to-moderate pain, inconsistency as to frequency of pain,

conflicting progress notes, and gaps in treatment.[427]  The Third Circuit has held, "where . .

. the ALJ has articulated reasons supporting a credibility determination, that determination

will be entitled to 'great deference.'"[428]  Thus, given this deferential standard, "the Court

cannot say there is not substantial evidence to support the ALJ's [credibility]

---

[421] D.I. 8 at 31.

[422] D.I. 12 at 21-22.

[423] 671 F.3d 640, 644 (7th Cir. 2012)

[424] D.I. 12 at 21-22; *see also Bjornson*, 671 F.3d at 644-46.

[425] *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) (clarified *Bjornson*).

[426] *Mayo v. Astrue*, CIV.A. 10-792-RGA, 2012 WL 3185418 at *10 (D. Del. Aug. 3, 2012) (upholding negative credibility determination where "to the extent testimony conflicts with above RFC assessment," the standard was employed and followed by discussion of record).

[427] D.I. 8 at 31-35; *see also Mayo*,  2012 WL 3185418 at *10 (finding ALJ's brief recitation of facts that merely "fit into" rubric provided by the regulations sufficient).

[428] *Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183, 189 (3d Cir. 2007) (quoting *Atlantic Limousine, Inc. v. NLRB*, 243 F.3d 711, 718 (3d Cir.2001)).

determination."[429]

## C.      VE Testimony

Plaintiff's final argument is the ALJ erred in relying on VE testimony from the March 2008 hearing, the transcript of which is outside the record before this court.[430] Additionally, plaintiff maintains the 2008 hypothetical is deficient because it does not consider his moderate mental limitations recognized in the 2011 decision.[431]   Defendant counters the ALJ was not obligated to rely on VE testimony from the 2011 hearing, and a work capacity limited to unskilled jobs without a production pace requirement sufficiently accommodates plaintiff's moderate mental limitations.[432]

Section 405(g) requires "the Commissioner of Social Security . . . file a certified copy of the transcript of the record *including the evidence* upon which the findings and decision complained of are based."[433]   Here, the ALJ explicitly based her conclusion that plaintiff is "capable of making a successful adjustment to other work that exists in significant number in that national economy" on VE testimony from the March 2008 hearing.[434]   No copy of the transcript of that hearing was provided to or filed with the court.[435]   As a result, the court cannot determine whether the ALJ's decision as to plaintiff's RFC is supported by substantial evidence.[436]   The ALJ must provide the basis

---

[429]  *Mayo*, 2012 WL 3185418 at *10.

[430]  D.I. 12 at 23; *see also* D.I. 8 at 36-37 (citing 2008 VE testimony). *See also id.* at 73 (order of Appeals Council requiring ALJ to "[o]btain evidence from a [VE] to clarify the effect of the assessed limitations on the claimant's occupational base.").

[431]  D.I. 12 at 24; D.I. 8 at 29-30.

[432]  D.I. 20 at 21; D.I. 8 at 30-31.

[433]  42 U.S.C. § 405(g) (emphasis added).

[434]  D.I. 8 at 36-37.

[435]  D.I. 8 Court Transcript Index (lacking March 17, 2008 hearing transcript).

[436]  42 U.S.C. § 405(g); *see also Smith v. Astrue*, 961 F. Supp. 2d 620, 658 (D. Del. 2013) ("In the end, the Court is left with an unclear record regarding the VE's testimony—the only evidence relied upon by the ALJ in determining that there were a significant number of jobs in the national economy [claimant]

for her conclusion on evidence found in the record.[437]  Therefore, remand is appropriate.[438]

### D.    Assignment to a Different ALJ

In a single closing remark, plaintiff suggests if remanded, the court should order the Commissioner to assign this matter to a different ALJ.[439]  There is no evidence that plaintiff raised any claim of bias either at the administrative level or before this court.

The Third Circuit in *Ginsburg v. Richardson*, found "[I]f the appellant felt that [he] was being deprived of a fair hearing, the proper procedure would have been for [him] to request the examiner to withdraw from the case.  Thus, appellant's failure to request withdrawal of the examiner during the hearing or in [his] request for review before the Appeals Council constitutes a waiver of [his] right to object to the conduct of the examiner."[440]

Based on the absence of any evidence that plaintiff requested withdrawal of the ALJ during the hearing or before the Appeals Council, he waived his right to object at this stage of the proceedings.

## VII.    ORDER AND RECOMMENDED DISPOSITION

For the reasons contained herein, IT IS RECOMMENDED that:

1.  Plaintiff's motion for summary judgment (D.I. 11) be GRANTED in part with the matter remanded for further consideration consistent with this Report and

---

could perform, given his RFC.  In order to affirm the ALJ's decision . . . the Court would have to speculate . . . [which] the Court cannot do . . . .  Under these circumstances, remand is appropriate . . . .").
[437] *Plummer,* 186 F.3d at 431.
[438] *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir.1987).
[439] D.I. 12 at 20.
[440] *Ginsburg v. Richardson*, 436 F.2d 1146, 1151-52 (3d Cir. 1971) (citing 20 C.F.R. § 404.922).

Recommendation.

      2.  Defendant's cross motion for summary judgment (D.I. 19) be DENIED.

      Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), FED. R. CIV. P. 72 (b)(1), and D. DEL. LR 72.1, any objections to the Report and Recommendation shall be filed within fourteen (14) days limited to ten (10) pages after being served with the same.  Any response shall be limited to ten (10) pages.

      The parties are directed to the Court's Standing Order in Non-Pro Se Matters for Objections Filed under FED. R. CIV. P. 72 dated October 9, 2013, a copy of which is found on the Court's website (www.ded.uscourts.gov.)

May 12, 2014                      /s/ Mary Pat Thynge
                                 UNITED STATES MAGISTRATE JUDGE